**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **GARY HAMMOND, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 3:01-CV-0811-VEH** |
| | } | |
| **THE REYNOLDS METALS COMPANY PENSION PLAN FOR HOURLY EMPLOYEES, et al.,** | } } } } | |
| | } | |
| **Defendants.** | } | **CONSOLIDATED WITH** |
| | } | |
| **THOMAS L. DAWSON, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 3:01-CV-0815-VEH** |
| | } | |
| **REYNOLDS METALS COMPANY,** | } } | |
| | } | |
| **Defendants.** | } | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

These consolidated cases arise under the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*  Pending before the Court is Defendants

Reynolds Metals Company ("Reynolds"), The Reynolds Metals Company Pension

Plan for Hourly Employees (the "Pension Plan"), and The Reynolds Metals Company Supplemental Unemployment Benefit Plan's (the "SUB Plan") Motion to Alter Or Amend the Judgment (Doc. #150) filed on February 9, 2006.[1,2]  Plaintiffs Gary Hammond, Michael Whitten, Thomas L. Dawson, and Jimmy C. Reed filed their response (Doc. #151) on February 21, 2006, and Defendants filed their reply (Doc. #153) on February 27, 2006.   As discussed more fully below, upon reconsideration Reynold's Motion for Summary Judgment (Doc. #123) is due to be granted in full.

## II.    LITIGATION BACKGROUND[3]

These purported class action cases arise out of Reynolds' sale of its manufacturing facilities in the Shoals area of Alabama to Wise Alloys, LLC and/or Wise Metals Co., Inc. ("Wise") in March of 1999.   The four named plaintiffs are former-union represented hourly employees, whose employment relationships with Reynolds ended on March 31, 1999, in connection with the sale of Reynolds' alloys facilities to Wise.   These former Reynolds employees subsequently accepted full-time

---

[1]For ease of reference, sometimes all named defendants are collectively referred to by the Court as "Reynolds."

[2]The Court will cite only to document members as they appear in 01-811.

[3]The Court uses a simple litigation background section as the nature of its opinion on summary judgment does not necessitate a conventional statement of undisputed and/or disputed facts.

employment with Wise.  The heart of this lawsuit involves a dispute over the benefits payable to Plaintiffs under the Pension and SUB Plans as a result of their ceasing to be employees of Reynolds.  As a result of prior rulings by the Court,[4] the substantive claims that remain pending against Reynolds are count five for Pension Plan benefits, and count six for SUB Plan benefits.[5]  (Doc. #59 ¶¶ 72-82).  Defendants' Motion to Alter Or Amend the Judgment challenges that portion of the Court's decision denying summary judgment on the benefit claims.

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing a court of the basis for its motion and

---

[4]On January 26, 2006, the Court entered a Memorandum Opinion (Doc. #147) and Order (Doc. #148) dismissing with prejudice Plaintiffs' breach of fiduciary claims.  To be clear, with this dismissal also went Plaintiffs' theories of equitable recovery including unjust enrichment, waiver, equitable estoppel, and disgorgement of profits based upon any alleged misrepresentations or other fiduciary mistakes made concerning either Plan.

[5]Count seven is a claim for reasonable attorney's fees.  (Doc. #59 ¶ 84).

3

identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary

4

judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial

5

burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.   ANALYSIS

### A.    Applicable Standard of Review Under ERISA

In its Memorandum Opinion (Doc. #147) entered on January 26, 2996, the Court concluded based in large part upon its reading of *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276 (11th Cir. 2003) that the appropriate standard of review was *de novo*.  The Court further determined that material factual disputes precluded the entry of summary judgment in favor of Defendants based upon this most stringent form of  ERISA review.

During the pendency of the submission of the parties' motions for summary judgment, the Eleventh Circuit Court of Appeals issued its decision in *Slomcenski v. Citibank*, 432 F.3d 1271 (11th Cir. 2005), which is the primary case upon which

Defendants have based their Rule 59 motion.  In *Slomcenski*, the Eleventh Circuit agreed with the district court's determination that the plaintiff had failed to raise a genuine issue of material fact as to the validity of an amendment that was included in a summary plan description and other materials but not in the text of the actual plan document.  432 F.3d at 1278.  The Court held a hearing in this case on March 2, 2006, to discuss with the parties the impact that *Slomcenski* should have upon the Court's analysis of what standard of review to use.  Having studied the parties' briefs and arguments presented on March 2, 2006, the Court is inclined to reconsider its decision on summary judgment and find that the arbitrary and capricious standard of review applies to Plaintiffs' benefits claims.

### 1.    Provisions Relating to Administration

The Pension Plan does not utilize the term "discretion."  Instead, the pertinent language of the Pension Plan states that its administration "shall be in charge of the representatives of the Company who shall have such authority and perform such duties, as may be determined by [Reynolds]."  (Doc. #126 at Ex. 3 at 37 § VII).

On the other hand, the summary plan description ("SPD") for the Pension Plan does contain discretionary language:

> Subject to the provisions of the applicable collective bargaining agreements, Reynolds Metal Company, in its capacity as the Plan Administrator, has the discretionary authority to interpret the terms of

the Plan and to decide factual and other questions relating to the Plan and Plan benefits, including without limitation questions relating to eligibility for, entitlement to, and payment of benefits.

(Doc. #126 at Ex. 3 at 20).[6]

### 2. Provisions Relating to Amendments

Under Article XXII of the Collective Bargaining Agreement ("CBA"), the Pension Plan and the SUB Plan are incorporated into the CBA by reference  (Doc. #126 at Ex. 4 at 27) and under Article XXXI, the CBA prohibits any modifications or changes unless "by mutual consent of the company and union or until terminated by either party as provided below."  (*Id.* at 35).  Similarly, the Pension Plan  provides for specific procedures regarding proposed changes.  (Doc. #126 at Ex. 3 at 39 § XIII).  The SUB Plan also contemplates mutual consent of the parties with respect to revisions:

Revisions in this Plan from the preceding Plan are effective on the dates

---

[6]The language contained in the SUB Plan and the SUB Plan's SPD is comparable:  the SUB Plan lacks express discretionary authority afforded to the administrator while the SUB Plan's SPD employs it.  (*Compare* Doc. #126 at Ex. 5 at 24 at Art. X § 11 ("The Company shall administer the Plan and establish such procedures and promulgate such regulations as are reasonably related to the administration of the Plan and subject to all of its terms and provisions") *with id.* at 11 ("Subject to the provisions of the applicable collective bargaining agreements, Reynolds Metals Company, in its capacity as the Plan Administrator, has the discretionary authority to interpret the terms of the Plan and to decide factual and other questions relating to the Plan and Plan benefits, including without limitation questions relating to eligibility for, entitlement to and payment of benefits")).

agreed to between the Company and the Union with regard to a collective bargaining agreement which incorporates this Plan by reference, notwithstanding that earlier effective dates of revisions may be shown in the Plan.

(Doc. # 126 at Ex. 5 at 24 at Art. X § 10).

Regarding amendments, the Pension Plan's SPD provides:

The Company expects to continue the Plan indefinitely, but reserves the right to change or end it subject to the terms of the collective bargaining agreement. The Company's decision to change or end the Plan may be due to changes in federal or state laws governing retirement benefits, the requirements of ERISA, or any other reason.

(Doc. #126 at Ex. 3 at 20). Similarly, the SUB Plan's SPD states that:

Reynolds expects to continue the Plan indefinitely but reserves the right to make administrative changes to the Plan or to amend or terminate the Plan at any time for any reason, subject to the provisions of the applicable collective bargaining agreements.

(Doc. #126 at Ex. 5 at 15).

### 3.    Amending Under ERISA in Light of *Slomcenski*

Plaintiffs maintain that the insertion of discretionary language into the SPDs is ineffective as an amendment to either the Pension Plan or the SUB Plan based upon the Eleventh Circuit's reasoning in *Shaw*, and is similarly invalid under the terms of the CBA. The issue for the Court to address is whether the discretionary language afforded in the SPD for the Pension Plan (and similarly, the SUB Plan) is enforceable in light of *Slomcenski* and in the context of the parties' collective bargaining

9

arrangement.[7]

The district court in *Slomcenski* relied upon the case of *Loskill v. Barnett Banks, Inc. Severance Pay Plan*, 289 F.3d 734 (11th Cir. 2002) in determining that the disputed mental/nervous limitation amendment was effective as it was included in the summary of material modifications, the summary plan description, and the plaintiff could not show bad faith or detrimental reliance with respect to the amendment. (*See* Doc. #62 at 16 in *Kimberly Slomcenski v. Citibank, N.A., et al.*, Case No. 8:02-CV-1819-T-27TGW, entered on Jan. 27, 2004). The Eleventh Circuit approved of the lower court's analysis regarding the validity of the mental/nervous limitation amendment. 432 F.2d at 1278 n.4 ("To the extent [the plaintiff] reasserts her earlier argument that the provision is invalid because it does not appear in the original Plan document, we agree with and adopt the reasoning of the district court.").

In *Loskill*, the Eleventh Circuit remanded an ERISA case to the district court "with the instruction that the district court further consider whether there was bad faith, active concealment, or detrimental reliance" regarding the amendment at issue.

---

[7]In the typical ERISA case, this language in the Pension Plan's SPD would be sufficient to bestow the administrator with full discretionary authority. *See, e.g., Cagle v. Bruner*, 112 F.3d 1510, 1516-17 (11th Cir. 1997) (finding appropriate reservation of discretion in plan's declaration of trust and trust rules and regulations document); *Jett v. Blue Cross and Blue Shield of Alabama*, 890 F.2d 1137, 1139 (11th Cir. 1989) (applying arbitrary and capricious standard of review based in part upon discretionary language included in plan's descriptive booklet).

It was undisputed in *Loskill* that the amendment procedures included in the subject plan were not technically followed.  Despite this noncompliance, the *Loskill* court stated:

> An employer or plan sponsor generally may "adopt, modify, or terminate" a welfare plan at will, but once it contractually cedes that right, it is bound by its contract. *Curtiss-Wright Corp.*, 514 U.S. at 78, 85, 115 S. Ct. 1223.  Despite this rule, courts typically will not invalidate an amendment for technical violations of a plan's procedures absent a showing of bad faith or active concealment on the part of the sponsor or detrimental reliance on the part of the beneficiaries. *Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 40 F.3d 1202, 1211-12 (11th Cir.1994) (per curiam); *Alford v. Kimberly-Clark Tissue Co.*, 14 F. Supp. 2d 1290, 1299 (S.D. Ala. 1998).  This approach has been found to "serve[ ] the dual purpose of protecting the rights of beneficiaries to the plan while allowing flexibility to the plans to grow or diminish at any time, as allowed by law." *Whitfield v. Torch Operating Co.*, 935 F. Supp. 822, 831 (E.D. La.1996).

289 F.3d at 738.

Considering the *Slomcenski* and *Loskill* decisions in conjunction with each other,[8] the Court is now persuaded that the discretionary language contained in the SPDs are effective, even if Defendants did not follow the appropriate amendment

---

[8]The Court recognizes that *Shaw*, at least at the appellate level, does not address any of the *Loskill* factors.  However, this lack of discussion may very well be because those types of issues were never raised on appeal.  Moreover, *Shaw* is distinguishable because it involved a contract of insurance which expressly set forth amendment procedures which mandated signed written evidence of mutual consent for an amendment to be valid.  The mutual consent provision at issue here does not expressly delineate the requirement of an executed writing for an amendment to be enforceable.

procedures because the record does not support a finding of bad faith or active concealment on the part of Defendants or alternatively detrimental reliance on Plaintiffs' part.[9]  Instead, both SPDs set forth on a fact page with a lead-in caption entitled **"Discretion Of The Plan Administrator,"** the level of discretionary authority afforded to the Plan Administrator.  While the Plans and SPDs differ in their language, this evidence alone does not support a conclusion that Defendants attempted to actively conceal the amendment.  Moreover, no evidence exists in the record that Plaintiffs relied upon the language included in the Plans over that contained in the SPDs to their detriment.

Plaintiffs have advanced the argument that the Court should use a heightened arbitrary and capricious standard due to the administrator's perceived conflict of interest.  *See Brown v. Blue Cross & Blue Shield of Ala.*, 898 F.2d 1556, 1566-67(11th Cir. 1990).  The Pension Plan establishes a non-reversionary trust out of which benefits are paid and the trust is funded by Reynolds through irrevocable payments.[10]  (Pension Plan, IX at 37; Doc. #129 at Ex. N ¶ 10).  The Eleventh Circuit

---

[9]In arriving at this conclusion, the Court need not (and does not) reach the issue of whether Defendants appropriately complied with the amendment procedures by inserting the discretionary authority in the SPDs without also modifying the respective Plans.

[10]The Court notes that in responding to Defendants' Motion for Summary Judgment, Plaintiffs point to the deposition testimony of Irene Jacobson, the former

has determined that these types of trust structures do not create a conflict of interest. *See Turner v. Delta Family-Care and Survivorship Plan*, 291 F.3d 1270, 1273-74 (11th Cir. 2002) (determining that no conflict of interest exists when benefits are paid from trust through irrevocable periodic contributions); *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997) (same).

The SUB Plan establishes a trust fund that is administered by an independent trustee, Chase Manhattan Bank, N.A., and Reynolds, based upon a predetermined rate, makes monthly payments to the fund. (Doc. #126 at Ex. 5 at 11; *id.* at Art. VII at 21). Additionally, all qualified and eligible Tier II and III employees are guaranteed SUB benefits. (Doc. #126 at Ex. 5 at Art. VIII at 22 § 2). As the Eleventh Circuit has stated, "[d]ecisions on behalf of a plan in the form of a trust lend themselves less readily to the accusation of conflicting interests and are more easily justified." *Brown*, 898 F.2d at 1567. Therefore, even though this particular trust structure is not described as non-reversionary, the Court still concludes that the arbitrary and capricious standard of review is appropriate.[11] Accordingly, the Court

_____

Director of Human Resources Services at Reynolds, in an effort to dispute the non-reversionary status of the Pension Plan. (Doc. #132 at 6). However, a review of her testimony clearly shows that Ms. Jacobson was referring to the SUB Plan as a "dry trust," not the Pension Plan. (Doc. #126 at Ex. 2 at 41-42).

[11]The Court notes that under Eleventh Circuit precedent, it need only reach the conflict of issue determination if it decides that Reynolds' SUB Plan determinations

generally concludes that the arbitrary and capricious standard of review is appropriate.  *See Brown*, 898 F.2d at 1558 n.1.

### 4.    Impact of the CBA

The Court's decision on reconsideration to apply the arbitrary and capricious standard to Plaintiffs' claims is further bolstered by its review of the collective bargaining cases cited by Defendants.  *See Eastern Air Lines, Inc. v. Schulte*, 861 F.2d 1546, 1550 (11th Cir. 1988) (describing objective factors to consider on intent to be bound by labor contract); *see also United Paperworkers Intern. Union v. International Paper Co.*, 920 F.2d 852, 855 (11th Cir. 1991) ("[A]ll that is required to find the existence of a collective-bargaining agreement is conduct by the parties manifesting an intention to be bound.") (citing *Eastern*, 861 F.2d at 1550).

In *Eastern*, the Eleventh Circuit set forth a list of the objective factors that the district court used in determining whether the parties had demonstrated an intent to be bound by a collective bargaining agreement.  These included:

> (1) the parties' past bargaining history, (2) whether the alleged agreement was reduced to a writing, (3) whether the alleged agreement was ratified by the union and signed by the employer, (4) whether the parties implemented the alleged agreement and subsequently operated

---

were wrong. *See, e.g., Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705-06 (11th Cir. 1995) (pointing out that determining whether a conflict of interest exists is appropriate after court concludes that it disagrees with administrative decision).

under its terms, and (5) whether the parties expressed an intent to adopt
a contract and to conclude collective-bargaining negotiations once the
alleged agreement was adopted.

*Eastern*, 861 F.2d at 1550.  Similar to the conclusion reached in *Eastern* that the

objective evidence demonstrated that the parties had an intent to be bound by the

collective bargaining agreement, the record in this case reflects an intention of

Plaintiffs and Defendants to be bound by the discretionary ERISA standard of review,

regardless of whether technical compliance with amending the specific language of

the Plans was met.  (*See, e.g.*, Doc. #150 at Ex. L (cover letter included with

distribution of new hand book to employees signed jointly by F. Robert Newman,

Vice President, Human Resources for Reynolds Metals Company and John J.

Murphy, Executive Assistant to President of Aluminum, Brick and Glass Workers

International Union)).  Moreover, the lack of any affirmative evidence showing an

employee's or union representative's objection to the use of a discretionary standard

of review under ERISA (prior to this lawsuit) also lends itself to the conclusion that

the parties intended to be bound by (and indeed operated under) that particular

standard as opposed to a less deferential one.

### B.    Propriety of Summary Judgment

Having determined that the arbitrary and capricious standard of review is

applicable, the Court now turns to an assessment of the propriety of summary

judgment.  In *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004), the Eleventh Circuit set forth a six-step model for use in judicially reviewing virtually all ERISA denials:

> (1)     Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision; if the decision is not wrong, then end the inquiry and affirm the decision).

> (2)     If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3)     If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4)     If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5)     If there is no conflict, then end the inquiry and affirm the decision.

> (6)     If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes omitted).  Turning to the arbitrary and capricious standard of review,[12] the Court is charged with determining whether

---

[12]The Court generally determined in its prior opinion that material issues of disputed fact precluded a decision as a matter of law when reviewing Plaintiffs' benefit claims under a *de novo* basis.

reasonable grounds exist for the administrator's decisions regarding benefits.

Under the arbitrary and capricious standard of review, the Court is limited to deciding whether Reynolds' interpretation of the relevant provisions of the Pension Plan was made "rationally and in good faith." *Cagle*, 112 F.3d at 1518. The underlying rationale of this deferential standard is that a court "defers to the discretion afforded the claims administrator under the terms of the plan" and takes corrective action only to prevent an abuse of an administrator's exercise of discretionary power. *See HCA Health Servs. of Ga. Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993-94 (11th Cir. 2001). Factors for a court to consider when reviewing for an abuse of administrative discretion include:

> (1) the uniformity of the Fund's construction; (2) the reasonableness of its interpretation; and (3) possible concerns with the way unexpected costs may affect the future financial health of the Fund.

*Cagle*, 112 F.3d at 1518 (citation omitted). Other relevant inquiries for the court to make are: "the internal consistency of a plan, the relevant regulations formulated by administrative agencies, and the factual background of the determination, including any inferences of bad faith." *Id.* at 1518 n.6 (citation omitted).

### 1.     Pension Plan Benefits

#### a.     Pension Credits

Section VI of the Pension Plan describes how participants can become eligible

17

for pension credit.  The Savings Clause in Section VI(A)(5) states:

> [i]n addition to the number of calendar quarters determined as above provided [receipt of wages, etc], the Employee's service under this Section VI shall also include any calendar quarter (not otherwise included) between such last hiring date and the date of retirement in which the Employee . . . was continuously absent from work due to lay off . . . but in no event will the Employee receive credit on account of such continuous absence for more than a maximum of eight (8) consecutive calendar quarters beginning with the [date the] Employee's absence from work commences [April 1, 1999] excluding any calendar quarter during such eight (8) consecutive calendar quarters otherwise credited to the Employee[.]

(Pension Plan, Section VI(A)(5)(a) at 34).  Reynolds' interpretation that the Savings Clause limits a participant to earning a maximum of eight quarters of pension credit (regardless of the pension credit source, *i.e.*, layoff, receipt of wages, etc.) was reasonable, especially in light of its decision to treat its sale to Wise as a plant shutdown for benefit purposes, which resulted in Plaintiffs' receiving more pension credit than they otherwise would have been eligible for under the applicable sale provisions.  Moreover, the counter-evidence relied upon by Plaintiffs does not support a finding that an abuse of discretion occurred.

**b.    Rule of 65 Pension**

Another group of participants, including Plaintiffs Hammond and Whitten, complain that they were one pension service credit away from (*i.e.,* one quarter short of) qualifying for a Rule of 65 Pension because of the timing of the Wise sale on

18

March 31, 1999, and challenge the determination that their "Last Day Worked" occurred on March 31, 1999, arguing instead for April 1, 1999.  The "Last Day Worked" is defined as the last day on which an employee performs duties relating to his employment "prior to the earlier of termination of seniority or an absence due to sickness, injury, layoff or leave of absence."  (Doc. #126 at Ex. 3 at 22).[13]

On March 31, 1999, Reynolds placed Plaintiffs Hammond, Whitten, and other similar hourly employees on layoff effective April 1, 1999.  (Doc. #129 at Ex. N ¶ 21).  Under that scenario, Reynolds' determination that Plaintiffs Hammond and Whitten's  "Last Day Worked" occurred on March 31, 1999, was reasonable.  Moreover, the evidence relied upon by Plaintiffs in opposition does not support a finding that Reynolds abused its discretion in reaching this determination.

### c.    Plaintiff Reed's Rule of 65 Pension Claim

Plaintiff Reed's claim for Rule of 65 Pension fails for some of the same reasons described above regarding the calculation his "Last Day Worked."  At the time of the Wise sale effective March 31, 1999, Reed's seniority with Reynolds

---

[13]The Court recognizes that Plaintiffs object to the definition of "Last Day Worked" as set forth in the SPD as an invalid amendment.  Plaintiffs' position on this issue fails for the same reason as their objection to the insertion of discretionary authority in the SPD—they are unable to show improper concealment, bad faith or detrimental reliance with respect to the language, which the Court has concluded is essential under its readings of *Slomcenski* and *Loskill*.

ended, he was placed on permanent layoff, and he became a Wise employee. (Doc. #129 at Ex. N ¶ 24). Also, Plaintiff Reed's attempt to derive extra pension credit arising from his 1980 termination is similarly unpersuasive under an arbitrary and capricious standard.

Moreover, Plaintiff Reed's pension argument fails for the additional reason that he has already arbitrated these same issues and lost. The arbitrator found first, that Plaintiff Reed had been terminated in June 1980, and accordingly properly did not receive pension service credit for that period. Second, the arbitrator determined that Plaintiff Reed's "Last Day Worked" was March 31, 1999, and therefore properly did not receive pension service credit for the second quarter of 1999. (Doc. #129 at Ex. H at 53; *id.* at Ex. U at 11-12).

The preclusive effect of binding arbitration serves as a bar to litigation of Plaintiff Reed's benefits claim. *See Greenblatt v. Drexel Burham Lambert, Inc.*, 763 F.2d 1352, 1360 (11th Cir. 1985) ("When an arbitration proceeding affords basic elements of adjudicatory procedure, such as an opportunity for presentation of evidence, the determination of issues in an arbitration proceeding should generally be treated as conclusive in subsequent proceedings, just as determinations of a court would be treated."); *Sanders v. Washington Metropolitan Area Transit Authority*, 819 F.2d 1151 (D.C. Cir. 1987) (court held that because union plaintiffs had already

arbitrated termination issue, those employees were estopped from litigation in federal court "by the doctrines of claim preclusion (res judicata) and issue preclusion (collateral estoppel) because the termination issues were either raised or should have been raised in the grievance process, and therefore cannot be pressed again"). Accordingly, because Plaintiff Reed has never claimed that the grievance and arbitration process was procedurally unfair or flawed and because his pension claims have already been conclusively decided in arbitration, his Rule 65 Pension claim is due to be dismissed on summary judgment for this alternative reason.

### d.   Rule of 70/80 and 55/40 Pension Claims

The Court's review of these particular Pension Plan claims is not appropriate due to Plaintiffs' lack of standing.  Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies."  Moreover, the Court has an ongoing obligation to, *sua sponte*, analyze and determine whether it has before it a justiciable case or controversy.  Whether a case or controversy exists turns on "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Wendy's Intern, Inc. v. City of Birmingham*, 868 F.2d 433, 436 (11th Cir. 1989) (quoting *Maryland Casualty Co. v. Pacific Oil Co.*, 312 U.S. 270, 273 (1941)).

As part of the case or controversy analysis, the Court must evaluate a party's standing to bring a lawsuit.  Standing is a snapshot of the justiciability of a plaintiff's claims at the time of filing.  *Atlanta Gas Light Co. v. Aetna Casualty and Surety Co.*, 68 F.3d 409, 414 (11th Cir. 1995).  Standing requires, at an "irreducible minimum," that the plaintiff has an "actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition." *Atlanta Gas Light,* 68 F.3d at 414.  Standing, therefore, emphasizes "whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy,' and whether the dispute touches upon 'the legal relations of parties having adverse legal interests.'" *Flast v. Cohen*, 392 U.S. 83, 100-101 (1968) (internal citations omitted). If a party lacks standing to bring a lawsuit (or a claim), then the court lacks subject matter jurisdiction to hear  it, and it is due to be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  Put differently, Plaintiffs' efforts to bring allegations on behalf of a class requires them to have standing to assert those claims. Accordingly, the Rule of 70/80 and 55/40 Pension benefit claims are due to be dismissed as a matter of law because Plaintiffs have not demonstrated "actual or threatened injury resulting from" Defendants' conduct as it relates to any one of them personally.

### 2.    SUB Plan Benefits

### a.    Standard SUB Pay

As testified to by several witnesses, including Plaintiffs Hammond and Whitten, the purpose of the SUB Plan is to give laid-off employees, who are working for a significantly reduced amount of money, supplemental compensation that will provide them with 70% of their former weekly wage at Reynolds, exclusive of any benefits. (Doc. #129 at Ex. C at 60-62; *id.* at Ex. E at 99; *id.* at Ex. F at 76). The components of the 70% calculation figure include state unemployment compensation received, all other income received by the laid-off employee (*i.e.*, wages from a new job), and the SUB payment (if applicable). (Doc. #126 at Ex. 5 at Article IV at 19-20). Historically, SUB benefits have never been paid at any Reynolds facility following a sale in which the purchaser continued to employ the former hourly workforce. (Doc. #129 at Ex. C at 58-59).

Prior to the completion of the sale, Wise and the various unions renegotiated the CBAs in place at the facility and agreed to certain concessions in employment pay and benefits. (Doc. #129 at Ex. X at 72; *id.* at Ex. I at 50, 54-55). As a result of these negotiations, all hourly employees took a $1.00/hr. wage cut and also received a less generous benefit package. (Doc. #129 at Ex. G at 20; *id.* at Ex. E at 19; *id.* at Ex. F at 22). The wage and benefit concessions were negotiated on Plaintiffs' behalf by

their unions (Doc. #129 at Ex. G at II at 18;[14] *id.* at Ex. E at 107; *id.* at Ex. H at II at 22), and these wage concessions were ratified by the union membership. *See Air Line Pilots v. O'Neil*, 499 U.S. 65, 78-79 (1991) (union did not violate its duty of fair representation even if it negotiated a "bad agreement" or less favorable but enforceable agreement than believed achievable by some union members); *see also Coppage v. U.S. Postal Service*, 281 F.3d 1200, 1205 (11th Cir. 2002) (determining that when union is acting as employee's exclusive bargaining representative under a collective bargaining agreement, actions taken by union on behalf of employee are binding on employee); *Walter v. State*, 38 So.2d 609, 612 (Ala. Ct. App. 1949) ("We entertain the view that [the employee] was bound by the terms of the agreement between the Union and the Company").

Plaintiffs all applied for and voluntarily accepted full-time employment with Wise (Doc. #129 at Ex. G at 114; *id.* at Ex. E at 151; *id.* at Ex. H at 67), even though they could have rejected the Wise offer and then sought state unemployment benefits and SUB pay. (Doc. #129 at Ex. G at 114; *id.* at Ex. H at 67). Reynolds' decision to deny SUB benefits to those employees who voluntarily applied for and accepted positions with Wise was reasonable given the undisputed evidence that they were

---

[14]The Court uses "II" to indicate that the page reference is to the transcript of the second deposition taken of the witness.

receiving in excess of the 70% benchmark as employees of Wise. (*See, e.g.*, Doc. #129 at Ex. C at 60 ("[Plaintiffs] had suitable employment because [the Wise pay rate] was [a] pretty significant amount of money.")). Moreover, the evidence relied upon by Plaintiffs does not create a material issue of disputed fact over whether the decision to deny the benefits was an abuse of discretion.

**b.    Short Week Benefits**

Under the SUB Plan, Plaintiffs also maintain that they are entitled to receive short week benefits for the week of March 31, 1999, because they did not work 32 hours for Reynolds during that week. Short week benefits are payable if an employee works less than 32 hours in a week because that employee's hours have been reduced stemming from a lack of work. (Doc. #126 at Ex. 5 at 9; *id.* at Art. V at 20). This minimum weekly wage benefit applies when there is a decline in work caused by some external factor; it is not payable under the circumstances of an employment relationship ending due to a facility sale to a new purchaser. (Doc. #129 at Ex. N ¶¶ 29-30).

The Court concludes that the decision not to pay Plaintiffs short week benefits is reasonable because all such employees actually received a full work week's worth of wages after the sale. Specifically, they were paid their weekly wage from Reynolds up to March 31, 1999, and then were paid the remainder of their weekly

wage from Wise. (Doc. #129 at Ex. O at 86).  The hourly employees were also able to combine their wages received from Reynolds with their wages received from Wise in order to collect overtime for that week. (*Id.*).  Additionally, Plaintiffs were able to combine the work week wages for that week in order to collect overtime.  (*Id.*)  Moreover, none of the evidence offered by Plaintiffs supports a determination that Reynolds abused its discretion in making this determination.[15]

Therefore, based upon the record before it, the Court concludes that no material factual disputes exist over Reynold's benefit determinations under both the Pension and SUB Plans when reviewing the decisions under an arbitrary and capricious basis. Accordingly, summary judgment is due to be granted to Defendants with respect to Plaintiffs' claims for benefits under the Pension and SUB Plans.

_____

[15]Alternatively, the Court concludes that even if it were to apply a heightened arbitrary and capricious standard of review to Reynolds' determinations under the SUB Plan, it does not disagree with them, and therefore, they are not "wrong." Moreover, Plaintiffs have not adequately demonstrated that the decision to deny SUB Plan benefits to Plaintiffs was "tainted by self-interest." *Williams*, 373 F.3d at 1138. In particular, Reynolds has offered evidence that the denial of SUB Plan benefits for employees that continued employment with a successor company was an unchallenged routine and historic company practice.  (Doc. #129 at Ex. C at 58-59); *see also Williams*, 373 F.3d at 1138 ("[I]f the administrator can demonstrate a routine practice or give other plausible justifications--such as benefitting the interests of other beneficiaries--judicial deference to it may be granted, since '[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries.'") (citing *Brown*, 898 F.2d at 1568).

## IV.   CONCLUSION

Upon reconsideration, Defendants' Motion for Summary Judgment is due to be granted in full.  More specifically, the Court concludes that in light of *Slomcenski* and *Loskill*, the  use of the arbitrary and capricious standard to evaluate Plaintiffs' claims is appropriate and that under this most deferential standard, no material factual dispute exists and Defendants are entitled to judgment as a matter of law as to Plaintiff's claims for benefits.  Additionally, Plaintiff's claims under the Rule of 70/80 and 55/40 Pension benefits are due to be dismissed due to Plaintiffs lack of standing to assert these claims.

The Court will enter an order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 4th day of April, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

27